## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VERSATA SOFTWARE, INC., F/K/A TRILOGY SOFTWARE, INC., and VERSATA DEVELOPMENT GROUP, INC., F/K/A TRILOGY DEVELOPMENT GROUP, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NETBRAIN TECHNOLOGIES, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 13-676-LPS-CJB |
| VERSATA SOFTWARE, INC., F/K/A TRILOGY SOFTWARE, INC., and VERSATA DEVELOPMENT GROUP, INC., F/K/A TRILOGY DEVELOPMENT GROUP, INC., <br><br> Plaintiffs, <br><br> v. <br><br> INFOBLOX, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 13-678-LPS-CJB |

## REPORT AND RECOMMENDATION

Presently pending before the Court are motions to dismiss for failure to state a claim

under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Motions"), filed by Defendants

NetBrain Technologies, Inc. ("NetBrain") and Infoblox, Inc. ("Infoblox") (collectively,

"Defendants"). (Civil Action No. 13-676-LPS-CJB, D.I. 10; Civil Action No. 13-678-LPS-CJB,

D.I. 8) Defendants argue that Plaintiffs Versata Software, Inc. and Versata Development Group,

Inc.'s (collectively, "Versata" or "Plaintiffs") asserted patents are directed to non-patent-eligible

subject matter pursuant to 35 U.S.C. § 101 ("Section 101"). For the reasons that follow, the Court recommends that Defendants' Motions be GRANTED-IN-PART.

## I.   PROCEDURAL BACKGROUND

Versata commenced these patent infringement actions on April 16, 2013. (Civil Action No. 13-676-LPS, D.I. 1; Civil Action No. 13-678-LPS, D.I. 1) Defendants filed the instant Motions in lieu of answering, and briefing was completed on November 22, 2013. (Civil Action No. 13-676-LPS, D.I. 17; Civil Action No. 13-678-LPS, D.I. 17) Since that date, Defendants have filed a number of notices of supplemental authority. (Civil Action No. 13-676-LPS, D.I. 26; Civil Action No. 13-678-LPS, D.I. 21, 25)[1] The Motions were referred to the Court for resolution by Chief Judge Leonard P. Stark on March 6, 2014. (Civil Action No. 13-676-LPS, D.I. 19; Civil Action No. 13-678-LPS, D.I. 19) After the Supreme Court of the United States issued its decision in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), the Court held oral argument on August 26, 2014. (Civil Action No. 13-676-LPS, D.I. 25; Civil Action No. 13-678-LPS, D.I. 24 (hereinafter, "Tr."))

## II.   STANDARD OF REVIEW

### A.   Motions to Dismiss Relating to Section 101 Issues

Pursuant to Rule 12(b)(6), a party may move to dismiss the plaintiff's complaint based on the failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The sufficiency of pleadings for non-fraud cases is governed by Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to

---

[1]   As the law relevant to the Motions has continued to develop substantially since the completion of briefing, the Court has considered the full content of these notices in resolving the Motions.

relief[.]" Fed. R. Civ. P. 8(a)(2). In order to survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). In assessing the plausibility of a claim, the court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted).

Here, the Motions filed pursuant to Rule 12(b)(6) are used to assert an affirmative defense. In that scenario, dismissal is permitted only if the well-pleaded factual allegations in the Complaint, construed in the light most favorable to the plaintiff, suffice to establish the defense. *See Jones v. Bock*, 549 U.S. 199, 215 (2007); *Kabbaj v. Google, Inc.*, Civ. No. 13-1522-RGA, 2014 WL 1369864, at *2 n.2 (D. Del. Apr. 7, 2014); *see also Genetic Techs. Ltd. v. Agilent Techs., Inc.*, 24 F. Supp. 3d 922, 927 (N.D. Cal. Mar. 7, 2014).

Patentability under Section 101 is a "threshold inquiry" and a question of law. *In re Bilski*, 545 F.3d 943, 950-51 (Fed. Cir. 2008), *aff'd, Bilski v. Kappos*, 561 U.S. 593 (2010). Yet this question of law is also one that "may be informed by subsidiary factual issues." *CyberFone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710, 715 (D. Del. 2012) (citing *In re Comiskey*, 554 F.3d 967, 976 (Fed. Cir. 2009)). Some members of the United States Court of Appeals for the Federal Circuit have suggested that "any attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear and convincing evidence[,]" *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1304-05 (Fed. Cir. 2013) (Rader, J., concurring-in-part and dissenting-in-part), but at least one other member of that Court has come to the opposite

3

conclusion, *see Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 720-21 (Fed. Cir. 2014)

("*Ultramercial III*") (Mayer, J., concurring), all of which has led to some uncertainty regarding

the appropriate standard of proof in Section 101 cases, *see Intellectual Ventures I LLC v.*

*Symantec Corp.*, — F. Supp. 3d — , C.A. No. 10-1067-LPS, C.A. No. 12-1581-LPS, 2015 WL

1843528, at *5-6 (D. Del. Apr. 22, 2015) (citing cases). However, even to the extent that the

"clear and convincing" standard of proof is applicable to Section 101 challenges, it would apply

only to the resolution of factual disputes, and not to resolution of pure issues of law. *See*

*TriPlay, Inc. v. WhatsApp Inc.*, Civil Action No. 13-1703-LPS, 2015 WL 1927696, at *5 (D. Del.

Apr. 28, 2015) (citing cases), *adopted in all substantive respects*, 2015 WL 4730907 (D. Del.

Aug. 10, 2015); *see also Affinity Labs of Tex., LLC v. Amazon.com, Inc.*, No.

6:15-CV-0029-WSS-JCM, 2015 WL 3757497, at *5 (W.D. Tex. June 12, 2015). And as to the

instant Motions, filed at the pleading stage (a stage at which any facts that might be in dispute are

to be construed in the light most favorable to the plaintiff), the "clear and convincing" standard

of proof should not come into play at all. *See Blue Spike, LLC v. Google Inc.*, Case No. 14-cv-

01650-YGR, 2015 WL 5260506, at *4 (N.D. Cal. Sept. 8, 2015); *Shortridge v. Found. Constr.*

*Payroll Serv., LLC*, Case No. 14-cv-04850-JCS, 2015 WL 1739256, at *7 (N.D. Cal. Apr. 14,

2015); *Modern Telecom Sys. LLC v. Earthlink, Inc.*, No. SA CV 14-0347-DOC, 2015 WL

1239992, at *7-8 (C.D. Cal. Mar. 17, 2015).

## B.     Need for Claim Construction

There is no hard-and-fast rule that a court must construe terms in the claims at issue

before it performs a Section 101 analysis. *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of*

*Can. (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("[W]e perceive no flaw in the notion that

4

claim construction is not an inviolable prerequisite to a validity determination under [Section] 101."). In some cases, claim construction is unnecessary. *See, e.g., Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 991-93 & n.1 (Fed. Cir. 2014) (holding that a patent claim was subject matter ineligible under Section 101, where the district court did not engage in claim construction, and where the plaintiff "d[id] not explain which terms require construction or how the analysis would change"). In other cases, such as when a Section 101 motion would be well taken even were a plaintiff's proposed claim construction to be accepted, a court may adopt the plaintiff's construction (or the construction most favorable to the plaintiff) for the purposes of the motion. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014); *Genetic Techs. Ltd. v. Lab. Corp. of Am. Holdings*, Civil Action No. 12-1736-LPS-CJB, 2014 WL 4379587, at *5-6 (D. Del. Sept. 3, 2014) (citing cases). Alternatively, the Court may decline to rule on a Rule 12 motion prior to engaging in claim construction, *see, e.g., Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 829, 835 (E.D. Tex. 2014) (Bryson, J., sitting by designation), or may deny the motion if it appears there are potential constructions of key claim terms that, if adopted, would render the claims subject matter eligible, *see TriPlay*, 2015 WL 1927696 at *3-6, *17-19.[2]

---

[2]    In its briefing, Versata relies heavily on the Federal Circuit's opinion in *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335 (Fed. Cir. 2013) ("*Ultramercial II*"), including to argue that patent infringement actions should rarely be dismissed at the pleading stage based on Section 101. (Civil Action No. 13-676-LPS, D.I. 15 at 9-11; Civil Action No. 13-678-LPS, D.I. 14 at 1-2) That opinion has since been vacated, and the Federal Circuit's subsequent opinion in the case reversed its prior decision in *Ultramercial II. Ultramercial III*, 772 F.3d at 709-12, *cert. denied sub nom.*, *Ultramercial, LLC v. WildTangent, Inc.*, 135 S. Ct. 2907 (2015). As such, *Ultramercial II* lacks precedential effect, and the Court will not consider it here. *See TriPlay, Inc.*, 2015 WL 1927696, at *4 n.3 (describing the differences between these *Ultramercial* decisions). It is now well-settled that it can be proper to address a Section 101 motion in a patent infringement action at the Rule 12(b)(6) stage. *See, e.g., Content Extraction*, 776 F.3d at 1349

## C.    Assessing Patentable Subject Matter

Patent-eligible subject matter is defined in Section 101 of the Patent Act:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101. In choosing such expansive terms "modified by the comprehensive 'any,'" Congress plainly contemplated that the patent laws would be given wide scope." *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980).

Yet while the scope of Section 101 is broad, there is an "important implicit exception [to it]: [l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (internal quotation marks and citation omitted); *see also Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012). "Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, [because] they are the basic tools of scientific and technological work." *Prometheus*, 132 S. Ct. at 1293 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

The Supreme Court has also recognized, however, that "too broad an interpretation of this exclusionary principle could eviscerate patent law." *Id.*; *see also Alice*, 134 S. Ct. at 2354. This

---

("The district court's resolution of [defendant's] motion to dismiss at the pleading stage was [] proper."); *Everglades Game Techs., LLC v. Supercell, Inc.*, Civil Action No. 14-643-GMS, 2015 WL 4999654, at *3 (D. Del. Aug. 21, 2015) ("While in some cases claim construction and discovery may be necessary to fully understand the claimed invention, there is no rule requiring that courts wait until a certain stage of litigation before addressing patent-eligible subject matter. And it is not uncommon for courts to rule on [Section] 101 motions at the pleading stage.") (citing cases).

is because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Prometheus*, 132 S. Ct. at 1293; *see also Alice*, 134 S. Ct. at 2354. To that end, it has explained that "an *application* of a law of nature, [natural phenomena or abstract idea] to a known structure or process may well be deserving of patent protection." *Diamond v. Diehr*, 450 U.S. 175, 187 (1981) (emphasis in original).

In terms of the process used to analyze patent eligibility under Section 101, the Federal Circuit has explained that a court should first identify whether the claimed invention fits within one of the four statutory classes set out in the statute: processes, machines, manufactures, and compositions of matter. *Ultramercial III*, 772 F.3d at 713-14. The court must then assess whether any of the judicially recognizable exceptions to subject matter eligibility apply, including whether the claims are to patent-ineligible abstract ideas. *Id.* at 714.[3]

In *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), the Supreme Court confirmed the framework to be used in order to distinguish patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. . . . If so, we then ask, "[w]hat else is there in the claims before us?" . . . To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. . . . We have described step two of this analysis as a

---

[3]      In the main, the parties' disputes are focused on whether the claims are drawn to patent-ineligible abstract ideas. Infoblox does also argue that certain claims of two of the patents do not fall into one of the applicable statutory classes. (Civil Action No. 13-678-LPS, D.I. 17 at 2-3) The Court will address these arguments in connection with its analysis of those patents below.

7

> search for an "'inventive concept'"—*i.e.*, an element or
> combination of elements that is "sufficient to ensure that the patent
> in practice amounts to significantly more than a patent upon the
> [ineligible concept] itself."

*Alice*, 134 S. Ct. at 2355 (quoting *Prometheus*, 132 S. Ct. at 1294-98) (citations omitted;

alterations in original); *see also Parker v. Flook*, 437 U.S. 584, 594 (1978). Since *Alice*, the

Federal Circuit has recognized that "[d]istinguishing between claims that recite a patent-eligible

invention and claims that add too little to a patent-ineligible abstract concept can be difficult, as

the line separating the two is not always clear." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773

F.3d 1245, 1255 (Fed. Cir. 2014).

## III.    DISCUSSION

In these related cases, Versata alleges infringement of a total of five patents, all of which

are at issue in the Motions. (Civil Action No. 13-676-LPS, D.I. 11; Civil Action No.

13-678-LPS, D.I. 9) Versata asserts U.S. Patents Nos. 6,834,282 (the "'282 patent") and

6,907,414 (the "'414 patent") against both NetBrain and Infoblox. (Civil Action No.

13-676-LPS, D.I. 1; Civil Action No. 13-678-LPS, D.I. 1) Versata additionally asserts U.S.

Patent Nos. 7,363,593 (the "'593 patent") and 7,426,481 (the "'481 patent") against Infoblox and

U.S. Patent No. 7,082,454 (the "'454 patent") against NetBrain. (*Id.*) These five patents are

unrelated, with each involving different inventors, specifications, and inventions. After

addressing a threshold issue that pertains to four of the five asserted patents, the Court will

discuss the subject matter eligibility of each patent in turn.

### A.    Assessment of the Eligibility of Particular Patent Claims

Versata has not identified the specific claims that it will be asserting in these actions other

8

than those in the '282 patent (as to which Versata is asserting only claims 21-23). (Civil Action No. 13-676-LPS, D.I. 1, 20; Civil Action No. 13-678-LPS, D.I. 1, 20) Accordingly, with regard to four of the five asserted patents here, Defendants seek a ruling that all 201 claims of these patents are not directed to patent-eligible subject matter. Despite this, in arguing the Motions' merits, Defendants focused the lion's share of their attention on particular claims for each patent (i.e., claim 1 of the '414 patent; claim 11 of the '593 patent; claim 50 of the '481 patent; and claim 1 of the '454 patent). In the briefing, nearly all of the remaining claims are addressed very briefly (e.g., in a sentence or less) or are not specifically addressed at all.[4]

At this early stage of the case, the Court declines to address claims other than those given meaningful attention by the movants. There is no indication that the parties have agreed that the particular claims focused upon are representative for purposes of the Court's Section 101 analysis. And with Defendants having given negligible attention to the remainder of the claims, the Court does not find it wise or appropriate to make a final determination as to the subject matter eligibility of such claims at this time. *See TriPlay*, 2015 WL 1927696, at *6 & n.6 (citing cases). In the end, as the moving party, Defendants bear the burden to demonstrate that their asserted Section 101 defense is well taken as to each claim. *Id.* In the absence of significant discussion regarding claims other than claim 1 of the '414 patent, claim 11 of the '593 patent, claim 50 of the '481 patent, and claim 1 of the '454 patent, the Court finds that Defendants have not carried their burden as to those claims. Therefore, below, the Court will address only asserted claims 21-23 of the '282 patent, claim 1 of the '414 patent, claim 11 of the '593 patent,

---

[4]     Infoblox, for example, did not provide any analysis with respect to any of the dependent claims of the patents asserted against it. (Civil Action No. 13-678-LPS, D.I. 9 at 7, D.I. 17)

9

claim 50 of the '481 patent and claim 1 of the '454 patent. *Id.*

## B.    Asserted Patents

### 1.    '282 patent

#### a.    The Invention

The '282 patent is entitled "Logical and Constraint Based Browse Hierarchy with Propagation Features" and was issued on December 21, 2004. It describes an invention meant to provide online sellers of goods and services with a flexible way of organizing products into a hierarchy for easy browsing by potential buyers. ('282 patent, col. 1:36-39)

The patent's specification explains that sellers offering products for sale on the Internet through electronic catalogs or websites must make decisions about how to present product information to potential buyers. (*Id.*, col. 1:52-55) One option for a seller is to mimic a buyer's interaction with a paper catalog by displaying a number of catalog pages on the buyer's computer screen, with each page containing descriptive product data. (*Id.*, col. 1:55-60) This is an impractical solution for sellers with a large number of products, however, because a buyer would likely have to browse too many pages before finding the sought-after product. (*Id.*, col. 1:61-67)

The specification recognizes that one way to make the browsing process easier for the buyer is to organize the products in the database into a hierarchical form that flexibly guides the buyer through the catalog to specific products of interest. (*Id.*, col. 2:1-7) The typical hierarchical structure categorizes catalog items, starting with general levels of specificity and gradually becoming more specific based on values of particular attributes associated with the items. (*Id.*, col. 2:7-11) This type of hierarchy resembles a simple tree structure, with higher-order nodes representing general classifications for items and lower-order nodes (the children of

10

the more general nodes) representing more narrow classifications. (*Id.*, col. 2:11-16) At the time

of the invention, sellers were required to store products in hierarchical databases along with

values for certain attributes, and items were split at each attribute level into predetermined nodes.

(*Id.*, col. 2:16-46) Accordingly, such hierarchies were only as flexible as that which was

preordained, and because the data were organized in a predetermined, set manner, each item

could be browsed via exactly one path through the hierarchy. (*Id.*, col. 3:19-28)

The patentee sought to provide a more flexible way of browsing items by inventing "a

hierarchy for representing a plurality of catalog items stored in a catalog database" that allows the

seller to organize the items in an arbitrary manner and the buyer to browse products through

multiple navigational paths to arrive at the same item. (*Id.*, cols. 3:29-35, 44-45, 4:47-51) The

items making up the claimed hierarchy are organized into two groupings resembling a tree-like

structure, beginning with a root node. (*Id.*, Abstract) The first type of grouping utilizes

constraints, which are based on attributes already stored in the database for particular items. (*Id.*,

cols. 3:58-60, 6:18-19) For example, a database containing computer and software products

might have node constraints such as "all items having PRODUCT TYPE=PC" and "all items

having PRODUCT TYPE=Software[,]" and child nodes might fall under these respective nodes

that are associated with processor clock speeds, or products offered by particular vendors. (*Id.*,

col. 8:4-45) The second type of constraints are based on logical groupings, which cannot be

specified by one or more constraints because the items do not necessarily have common

attributes. (*Id.*, Abstract & col. 3:35-40) Instead, this type of grouping enables the seller to

classify the products into arbitrary groups. (*Id.*, col. 7:52-66) For example, the seller could

establish a "clearance" grouping that includes particular products that have been placed on

11

clearance, even ones that do not share any common attributes. (*Id.*, col. 9:34-44) This type of

grouping allows the seller to create a customizable hierarchy without having to modify the

underlying database to add a clearance attribute to such items. (*Id.*, col. 9:38-40)

The patent contains three independent claims (claims 1, 11 and 21). The asserted claims

are independent claim 21 and dependent claims 22 and 23, both of which are dependent on claim

21. ('282 patent, col. 12:19-56)[5] Claim 21 claims a method of browsing information using a

hierarchy:

> **21.** A method of browsing items stored in a database using a
> hierarchy, each of the items associated with one or more attributes,
> each of the attributes having one or more values, said method
> comprising:
>
>> [(1)] apportioning the plurality of items into subsets;
>>
>> [(2)] representing each of the subsets with a node in a
>> hierarchy, each of the nodes being a child of one other
>> node, except for a root node, which is a child of no other of
>> the nodes and is an ancestor of all of the nodes in the
>> hierarchy;
>>
>> [(3)] specifying one or more constraints for each of a first
>> portion of the nodes, the constraints defining a scope of the

---

[5]     On June 6, 2014, Versata filed Notices of Limitation of Asserted Claims with
respect to the '282 patent in both cases, indicating that it would only be asserting claims 21-23.
(Civil Action No. 13-676-LPS, D.I. 20; Civil Action No. 13-678-LPS, D.I. 20) The Notice
explained that the Patent Trial and Appeal Board ("PTAB") of the United States Patent and
Trademark Office had instituted a covered business method ("CBM") review with respect to
claims 1-20 of the '282 patent, but had declined to review claims 21-23. (*Id.*) In the decision on
the issue, the PTAB explained that with respect to claims 21-23, the petitioner did not make a
sufficient showing for review because it failed to address all limitations of these claims.
*Volusion, Inc. v. Versata Software, Inc.*, Case CBM2013-00017, 2013 WL 8538865, at *10
(P.T.A.B. Oct. 24, 2013). Prior to the PTAB's issuance of a final written decision with respect to
claims 1-20, Versata and the petitioner reached a settlement, and the PTAB therefore granted the
parties' joint motion to terminate the proceeding. *Volusion, Inc. v. Versata Software, Inc.*, Case
CBM2013-00017, 2014 WL 2797106 (P.T.A.B. June 17, 2014).

subset of items represented by each of the first portion; and

[(4)] establishing a logical grouping of the items for a second portion of the nodes, the logical grouping defining a scope of the subset of items represented by each of the second portion of nodes, no constraints being specified for any of the second portion of the nodes;

[(5)] displaying said hierarchy on a computer terminal, wherein each of said nodes are operative to be activated by selecting the node;

[(6)] aggregating the constraints specified by a leaf node and its ancestors in response to selection of one of the leaf nodes;

[(7)] forming a search rule from the aggregation that includes all items that meet the constraints;

[(8)] initiating a search of the database in accordance with the search rule; and

[(9)] returning to the terminal a list of the items that meet the constraints.

(*Id.*, col. 12:19-52) Claims 22 and 23 depend from claim 21. Claim 22 indicates that the terminal is connected to the database over a network, and claim 23 indicates that the network is the Internet. (*Id.*, col. 12:53-56)

### b. *Alice*'s step one

Under step one of *Alice*, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter" (here, an abstract idea). *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015); *see also TriPlay*, 2015 WL 1927696 at *8, *10. "The 'abstract ideas' category embodies 'the longstanding rule that [a]n idea of itself is not patentable.'" *Alice*, 134 S. Ct. at 2355 (quoting *Gottschalk*, 409 U.S.

at 67) (certain quotation marks omitted) (alteration in original). The abstract idea can be, but need not amount to, a "preexisting, fundamental truth" about the natural world "that has always existed[,]" or a "method of organizing human activity" (such as a "longstanding commercial practice"). *Id.* at 2356 (citations omitted); *see also DDR Holdings*, 773 F.3d at 1256; *cf. CLS Bank*, 717 F.3d at 1286 (explaining that a claim directed to an abstract idea is one directed to a "disembodied concept . . . a basic building block of human ingenuity, untethered from any real-world application") (citations omitted). Beyond that, the concept of an "abstract idea" has not been crisply defined. *Alice*, 134 S. Ct. at 2357 (declining to "labor to delimit the precise contours of the 'abstract ideas' category"); *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1331 (Fed. Cir. 2015) (recognizing that application of the abstract idea concept can be difficult, "a problem inherent in the search for a definition of an 'abstract idea' that is not itself abstract").

Defendants argue that the asserted claims of the '282 patent are directed to the abstract idea of representing data in a hierarchy. (Civil Action No. 13-676-LPS, D.I. 11 at 8-9; D.I. 17 at 4-5; Civil Action No. 13-678-LPS, D.I. 9 at 7) Claim 21 of the '282 patent (and its dependent claims 22 and 23) describe several steps for browsing information using a hierarchy. ('282 patent, col. 12:19-52) These steps include: (1) "apportioning" numerous items into subsets; (2) "representing" each subset with a node in a hierarchy; (3) "specifying" constraints for each of a group of nodes; (4) "establishing" a logical grouping for each of a second group of nodes; (5) "displaying" the resulting hierarchy on a computer terminal where each node is "operative to be activated by selecting the node"; (6) "aggregating" constraints for a selected node; (7) "forming" and (8) "initiating" a search of the database for information meeting those constraints; and (9)

14

"returning" to the computer a list of the results. (*Id.*)[6] In essence, the claim involves creating and displaying the hierarchical representation of data in particular ways, adding various constraints to form a search query, submitting that search query to the database and returning the search results. (*Id.*; *see also* Tr. at 37-39)

The Court easily concludes (indeed, it is not really disputed here) that the concept of representing information in a hierarchy amounts to an abstract idea. Clearly, "[a] hierarchy is itself an abstraction"—an organizational structure through which data can be represented. (Civil Action No. 13-676-LPS, D.I. 11 at 9, 12; *see also* Civil Action No. 13-678-LPS, D.I. 9 at 8; Tr. at 33-34)[7] Indeed, the patent specification confirms that a hierarchy is a "typical[]" way of organizing catalog items in a database. ('282 patent, col. 2:1-11) And, as the patent suggests, (*id.*), one can almost instantly conjure up a variety of contexts in which humans present information in hierarchical form. For instance, individuals track their ancestry utilizing family

---

[6]     Versata asserts that claim construction is required prior to resolution of the Section 101 issue for this patent (and, indeed, for all of the patents at issue). (Civil Action No. 13-676-LPS, D.I. 15 at 15-16; Civil Action No. 13-678-LPS, D.I. 14 at 17-18) Unless otherwise indicated in the Court's discussion of an individual patent below, however, Versata has merely argued that the claims of the patents require a computer database, without further articulation of how claim construction is necessary to addressing the Section 101 issue. (Civil Action No. 13-676-LPS, D.I. 15 at 16; Civil Action No. 13-678-LPS, D.I. 14 at 17; Tr. at 53-55, 70) Accordingly, for purposes of these Motions, the Court will assume that the claims of the asserted patents require a computer database, and that where applicable, a computer performs the actions called for in the claims. *See Content Extraction*, 776 F.3d at 1349.

[7]     Defendants further argue that, aside from the question of abstractness, the claims of the '282 patent that are directed to a "hierarchy" are patent ineligible because a hierarchy does not fit within any of the four statutory categories of patentable subject matter—"process, machine, manufacture, or composition of matter." (Civil Action No. 13-676-LPS, D.I. 11 at 9; Civil Action No. 13-678-LPS, D.I. 17 at 2; Tr. at 32-33) However, it does not appear that Defendants intended this argument to apply to the presently asserted claims 21-23, which are clearly method claims; therefore, the Court does not further address it here. (*See* Tr. at 33-34)

15

trees and companies represent employee levels in hierarchical form.[8]

The Court also concludes that the asserted claims are directed to this abstract idea. For example, it is clear that the "majority of the limitations" in the claims are drawn to the idea. *See Ultramercial III*, 772 F.3d at 715 (holding that the claim was drawn to an abstract idea where "the concept embodied by the majority of the limitations" described only the abstract idea of showing an advertisement before delivering free content). Steps 1 through 4 of claim 21 describe a particular process of representing data through a hierarchical structure, and step 5 involves the displaying of that hierarchy. (*See* Tr. at 36-37) Although remaining steps 6, 7, 8 and 9 relate to running a search of that data structure and returning the results, (*see id.* at 37), these portions of the claim are not of sufficient prominence for the Court to conclude that the claim's character is directed to anything other than the abstract idea at issue. Instead, the concept at the "heart" of the claim, *see Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344

---

[8]      The abstract idea reflected in the '282 patent is comparable to other similar concepts (involving the organization of data in a particular structure, so that it can be searched for retrieval of data) that, in several recent cases, have been deemed to be abstract. *See Versata Dev. Grp.*, 793 F.3d at 1333-34 (claims at issue were directed to the abstract idea of "[u]sing organizational and product group hierarchies to determine a price"); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. PWG-14-111, 2015 WL 5165442, at *7-9 (D. Md. Sept. 2, 2015) (finding that a patent was drawn to an abstract idea where its claims pertained to organizing data into a hierarchy and displaying and manipulating that data); *Encyclopaedia Britannica, Inc. v. Dickstein Shapiro LLP*, Civil Case No. 10-454 (RCL), 2015 WL 5093798, at *6 (D.D.C. Aug. 27, 2015) (finding that claims directed to collecting, recognizing and storing data in a database, so that it can be easily found and retrieved, were directed to an abstract idea, and noting that humans have been collecting, organizing and storing information in printed form for thousands of years, predating the advent of computers, such that this conduct amounts to "fundamental human activit[y]"); *Hewlett Packard Co. v. ServiceNow, Inc.*, Case No. 14-cv-00570-BLF, 2015 WL 1133244, at *7-9 (N.D. Cal. Mar. 10, 2015) (patent claimed abstract idea of "categorizing and organizing information into a hierarchy"); *Enfish, LLC v. Microsoft Corp.*, 56 F. Supp. 3d 1167, 1175-76 (C.D. Cal. 2014) (recognizing that "[f]or millennia, humans have used tables to store information. . . . a basic and convenient way to organize information on paper . . . [and] on computers").

(Fed. Cir. 2013), is the abstract idea itself. *See TriPlay, Inc.*, 2015 WL 1927696, at \*10-11 (concluding that elements of claim associated with computer technology were well overtaken by the articulation of the abstract idea itself).

Were there any doubt about this conclusion, the '282 patent specification helps confirm it. *See Internet Patents Corp.*, 790 F.3d at 1348 (looking to the patent specification's description of the invention to determine whether the "character of the claimed invention" is an abstract idea). The specification states that "[*t*]*he invention is a hierarchy* for representing a plurality of catalog items stored in a catalog database." ('282 patent, col. 3:44-45 (emphasis added)) The patent itself, then, summarizes the invention as constituting a conceptual organizational structure, an abstract idea. The Court thus proceeds to step two of the *Alice* framework.[9]

### c. *Alice's* step two

The asserted claims of the '282 patent may still be patent-eligible if they contain an "inventive concept" sufficient to "ensure that the patent in practice amounts to significantly more" than a patent upon an ineligible concept. *Alice*, 134 S. Ct. at 2355 (citation omitted). There is no "inventive concept" if a claim only recites an abstract idea implemented using "generic" technology to "perform well-understood, routine, and conventional activities commonly used in the industry." *Content Extraction*, 776 F.3d at 1348. Neither "limiting the use of an abstract idea to a particular technological environment[,]" nor simply stating an abstract

---

[9]      In addressing step one of the *Alice* framework, Versata also asserts that the '282 patent (and, indeed, all of the asserted patents) is drawn to "an improvement in computer software itself[,]" removing the claims from the realm of those directed to intangible abstract ideas. (Civil Action No. 13-676-LPS, D.I. 15 at 13; Civil Action No. 13-678-LPS, D.I. 14 at 12-13) In light of the above analysis, the Court will address this argument in its review of *Alice*'s step two.

idea and adding the words "apply it[,]" will transform an abstract idea into a patent-eligible invention. *Alice*, 134 S. Ct. at 2358 (internal quotation marks and citations omitted).

In assessing step two with respect to the '282 patent, it is helpful to look first to the patent's other independent claims, even though they are not asserted here. These claims essentially describe the abstract idea identified above. Claim 1 is directed to "[a] hierarchy for representing a plurality of items stored in a database" that mimics steps one through four of claim 21 set out above. ('282 patent, col. 10:46-61)[10] Likewise, claim 11 is directed to "[a] method of representing a plurality of items in a database hierarchically" that again mimics steps one through four of claim 21. (*Id.*, col. 11:25-44)[11] The '282 patent refers to Figure 3 therein as an example of the claimed hierarchy, reproduced below:

---

[10] Specifically, claim 1 claims: "**1.** A hierarchy for representing a plurality of items stored in a database, said hierarchy comprising: a plurality of nodes each representative of a subset of the items; and wherein: [1] each of the nodes is a child of one other node, except for a root node, which is a child of no other node and is an ancestor of all of the nodes; [2] a first portion of the nodes each specify one or more constraints defining a scope of the subset of items represented by each of the first portion relative to their parent node; and [3] a second portion of the nodes specify no constraints, each of the second portion establishing a logical grouping defining a scope of the subset of the items represented by each of the second portion." (*Id.*)

[11] Specifically, claim 11 claims: "**11.** A method of representing a plurality of items in a database hierarchically, each of the items associated with one or more attributes, each of the attributes having one or more values, said method comprising: [1] apportioning the plurality of items into subsets; [2] representing each of the subsets with a node in a hierarchy, each of the nodes being a child of one other node, except for a root node, which is a child of no other of the nodes and is an ancestor of all of the nodes in the hierarchy; [3] specifying one or more constraints for each of a first portion of the nodes, the constraints defining a scope of the subset of items represented by each of the first portion relative to their parent node; and [4] establishing a logical grouping of the items for a second portion of the nodes, the logical grouping defining a scope of the subset of items represented by each of the second portion of nodes, no constraints being specified for any of the second portion of the nodes." (*Id.*)

18



The patent explains that the circles depicted in Figure 3 are the various "nodes" referred to in the claims. (*Id.*, cols. 7:39-40, 8:20-27, 9:36-44) In this example, some of the nodes specify constraints such as "Compaq" and "HP" meaning the items stored within those nodes must be made by Compaq or HP. Other sets of nodes do not specify constraints but are instead arranged as a logical grouping, such as node 157 labeled "Clearance[,]" meaning that any item desired can be stored in that node. (*Id.*, col. 9:36-44; *see also* Tr. at 34-35) It is clear enough, as was discussed above, that simply to claim a certain type of hierarchy and a certain method of representing such a structure (with nothing more) is to claim an abstraction. *Cf. Volusion, Inc. v. Versata Software, Inc.*, Case CBM2013-00017, 2013 WL 8538865, at *7-8 (P.T.A.B. Oct. 24,

2013) (explaining in a decision to grant CBM review that claim 1 of the '282 patent "constitute[s] no more than a conceptual framework" and that claim 11 "consists of steps that can be performed in the human mind, or by a human using a pen and paper[,]" steps that are "not patent eligible"). The question is whether any additional elements found in asserted claims 21-23 add enough to make this a patentable invention.

Defendants, for their part, assert that all claim 21 does is "add [] trivial elements" to the claimed abstraction: "displaying" the claimed hierarchy on a computer terminal where each node is "operative to be activated by selecting the node," "aggregating" constraints for a selected node, "forming" and "initiating" a search of the database for information that meets those constraints, and "returning to the terminal" a list of items that meets the constraints. (Civil Action No. 13-676-LPS, D.I. 11 at 12; *see also* Civil Action No. 13-678-LPS, D.I. 9 at 10 ("[a]t *most* the[] additional steps [in claim 21] call for using conventional, general-purpose computer technology") (emphasis in original); Tr. at 37-39) According to Defendants, dependent claims 22 and 23 fare no better, merely reciting claim 21's method wherein the terminal is connected to the database over a network and wherein that network is the Internet. ('282 patent, col. 12:53-56; Civil Action No. 13-676-LPS, D.I. 17 at 6; Tr. at 39)

Defendants are correct. The patent claims do not require anything beyond the use of generic and conventional computer hardware and software. As the patent explains:

> In particular, the invention is neither limited by the types of computers used as servers, nor the operating systems, web server or database server application software running on such servers. The invention is limited neither by the types of user terminals used to connect to the servers, nor the type of browser software resident on the terminals. The invention is neither limited by the structure of the data as stored in the database, nor is it limited by the nomenclature used in identifying data types and attributes. The

20

> invention . . . may be implemented over any network . . . . Many
> embodiments of the present invention have application to a wide
> range of industries including the following: computer hardware and
> software manufacturing and sales, professional services, financial
> services, automotive sales and manufacturing, telecommunications
> sales and manufacturing, medical and pharmaceutical sales and
> manufacturing, and construction industries.

('282 patent, col. 10:25-43; *see also id.*, col. 5:60-62)[12] Moreover, the computer functions

described in the claims—displaying information on a computer terminal, aggregating constraints,

performing a search and returning the results—are "purely conventional computer activity" that

cannot save the claims from the realm of abstraction. (Tr. at 37, 39); *see Versata Dev. Grp.*, 793

F.3d at 1334 (finding no inventive concept where the limitations at issue were "either inherent in

the abstract idea of determining a price using organization and product group hierarchies—e.g.,

arranging the hierarchies—or conventional and well-known limitations involving a

computer—e.g., storing pricing information"); *Content Extraction*, 776 F.3d at 1348-49 (where

additional limitations "recite well-known, routine, and conventional functions of [] computers[,]"

that does not amount to "an 'inventive concept' that transforms the corresponding claim into a

patent-eligible application of the otherwise ineligible abstract idea"). As if to underscore this,

when asked at oral argument how the computer-related terms in claim 21 contributed to the

inventive concept at issue, Versata's only response was that "it saves processing time . . . . [it]

save[s] computing time." (Tr. at 65-67) It is well-settled, however, that "claiming the improved

speed or efficiency inherent with applying the abstract idea on a computer [does not] provide a

---

[12]      *See Alice*, 134 S. Ct. at 2358 ("[T]he mere recitation of a generic computer cannot
transform a patent-ineligible abstract idea into a patent-eligible invention."); *TriPlay, Inc.*, 2015
WL 1927696, at *15 (explaining that limitations involving generic computers are "not sufficient
to render the claim patent eligible").

sufficient inventive concept." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015); *see also Personalized Media Commc'ns, LLC v. Amazon.com, Inc.*, — F. Supp. 3d — , Civil Action No. 13-1608-RGA, 2015 WL 4730906, at *9 (D. Del. Aug. 10, 2015).

Versata's other bare-bones arguments that the asserted claims contain an inventive concept are not persuasive. In its briefing, for example, Versata asserted that the '282 patent claims patent-eligible subject matter because it "is directed towards an improvement in computer software itself, not adapting computer software to implement a method commonly practiced in the human mind." (Civil Action No. 13-676-LPS, D.I. 15 at 13; Civil Action No. 13-678-LPS, D.I. 14 at 13) Yet Versata failed to offer any articulation in its briefs as to *how* the asserted claims constitute such an improvement. (*Id.*) When pressed further on this issue at oral argument,[13] Versata's counsel pinpointed the presence of the "representing, specifying, establishing and aggregating steps," taken "together," as constituting the inventive concept of the asserted claims. (Tr. at 64-65, 68) This concept, according to Versata's counsel, satisfies step two of *Alice* because it amounts to "a better method for presenting information contained in the database that is not necessarily constrained by the information that is already programmed into that database"—"an easier way to group things by a programmer for [] a user without [having to] chang[e] the information that's already in the database." (*Id.* at 61, 68) This is accomplished by "creat[ing] a . . . node that is a logical grouping, which means that it is not based on constraints that are already within the database . . . . which allows [the programmer] to group those items for

---

[13]     While *Alice* had not been decided by the Supreme Court at the time of briefing, the opinion was issued a few months before oral argument.

22

the user without going back to the database and changing the constraints[.]" (*Id.* at 61, 64)

Yet what Versata highlights here as the inventive concept is the creation of a particular hierarchy of data from information stored in a database, and performing a search of that data—really nothing more than the abstract idea itself. While it may not have been conventional to logically group certain items stored hierarchically in a database (i.e., to group them without constraints), the novelty of a claim does not alone render it patent-eligible. *See, e.g.*, *Encyclopaedia Britannica, Inc. v. Dickstein Shapiro LLP*, Civil Case No. 10-454 (RCL), 2015 WL 5093798, at *10 (D.D.C. Aug. 27, 2015) (rejecting the patentee's argument that claims directed to a searchable computerized encyclopedia were patentable because they constituted a technological breakthrough, explaining that "[t]he concern of [Section] 101 is not novelty but preemption"); *Personalized Media Commc'ns, LLC.*, 2015 WL 4730906, at *6 ("Practicing an abstract idea in a novel way is still practicing an abstract idea."); *Netflix, Inc. v. Rovi Corp.*, Case No. 11-cv-6591 PJH, 2015 WL 4345069, at *9 (N.D. Cal. July 15, 2015) (explaining that "an unconventional abstract idea is still an unpatentable abstract idea" and that to survive Section 101, the patentee must "show an unconventional *embodiment* of that idea") (emphasis in original); *Cloud Satchel, LLC v. Amazon.com, Inc.*, 76 F. Supp. 3d 553, 564 (D. Del. 2014) (recognizing that certain limitations "may not have been conventional practices in the field of computing a[t] the time of [the] invention" but finding no inventive concept in the claims). And though this perhaps novel idea must (accepting Versata's proposed construction of claim 21) be implemented on a computer database, the claim cannot be said to "improve the functioning of the computer" because it does not "claim an improvement to the computer, but rather describe[s] how to apply the abstract idea of [representing information in a hierarchy in particular ways] to

23

pre-existing, conventional computers." *Cloud Satchel, LLC*, 76 F. Supp. 3d at 564. In other words, here the computer is not "integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not." *Bancorp*, 687 F.3d at 1278.

In setting out the Court's conclusion here, it is useful to contrast the asserted claims of the '282 patent with claims that the Court recently found should survive a motion to dismiss filed on Section 101 grounds. In *Execware, LLC v. BJ's Wholesale Club, Inc.*, Civil Action No. 14-233-LPS, 2015 WL 4275314 (D. Del. June 15, 2015), the claim at issue was directed to improving then-existing programs for searching databases. *Execware*, 2015 WL 4275314, at *1. These programs were time-consuming and difficult to navigate for the ordinary user, because they required utilization of precise and specified steps for the selection of different sort parameters and subsets of data for viewing. *Id.* The patentee claimed a new user interface that would allow the ordinary user to quickly select and sort data from a database without requiring assistance from specialized personnel or other resources. *Id.* at *2. The key claim involved a method for using a computer system to sort and display text data objects, whose steps consisted of: (1) imaging, on a display device, a query dialog box, (2) "wherein the query dialog box displays each of a plurality of parameters associated with each of the text data objects, forms a plurality of spaces for listing values associated with each displayed parameter, and further forms a space for selecting a sort order"; (3) designating a parameter value for each displayed parameter; (4) constructing a sort order from the displayed parameters in the space for selecting a sort order; (5) selecting text data objects satisfying the designated values; and (6) sorting the selected text data objects according to the constructed sort order. *Id.* (citation omitted).

The Court found that, construing the facts in the light most favorable to the patentee, the

24

claim's query dialog box limitation amounted to an inventive concept. *Id.* at *13. In arriving at this conclusion, the Court stressed that the claim described a specific solution—the use of the claimed query dialog box containing particular features—to an identified problem particular to the realm of computer databases (that the design of a custom database query using the then-existing software was a time-consuming process that interrupted the user's line of thought). *Id.* at *11, *13. The Court further noted that the claim did not broadly and generically claim the use of a computer to perform an abstract idea, but instead "'specif[ies] how interactions with the [computer] are manipulated to yield a desired result' by describing *a particular interface* to be used on a computer, and how certain aspects of that interface are used to improve the functioning of the computer—by allowing the user to interact with the computer in a more efficient way." *Id.* at *13 (quoting *DDR Holdings*, 773 F.3d at 1258) (emphasis added); *see also id.* at *15 (indicating that the claim at issue "claims a specific interface for allowing a user to more easily (and, to be sure, more quickly) *interact with a computer*, in a way preferable to the methods used in the prior art") (emphasis in original). As for the defendant's assertion that the computer-related elements were conventional and generic, the Court explained that while the individual elements used to build the claimed invention were generic and conventional when considered alone, the inventive concept was the creation of a *specific* interface, the query dialog box, that "represents a departure from the conventional operation of computers at the time[.]" *Id.* at *15.

The kind of improvement to a computer system that contains particularized features—the inventive concept that was key to the holding in *Execware*—is nowhere to be found in the asserted claims of the '282 patent. Instead, the limitations here describe in broad, functional terms the presentation of information in hierarchical form (with constraints having been specified

for some data, and with other data having been logically grouped), with generic computer technology then being used to implement that abstract idea, through the aggregation of selected constraints and the running of a search. Thus, were the asserted claims deemed patent eligible, this would stifle virtually any innovation related to the computerized representation of items in a hierarchy whereby some items are defined by constraints and other items are not.

For these reasons, the Court concludes that the asserted claims of the '282 patent do not contain an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible invention. Therefore, the Court recommends that the Motions be granted as to claims 21-23 of the '282 patent.

### 2.   '414 patent

#### a.   The Invention

The '414 patent, asserted against both NetBrain and Infoblox, is entitled "Hierarchical Interface to Attribute Based Database" and was issued on June 14, 2005. It describes an invention meant to provide a client with the ability to access an attribute-based database (such as an online catalog) as if the database were a file system, with the data organized in a hierarchical structure. ('414 patent, cols. 1:7-10, 5:4-7)

The patentee sought to provide a simpler method of providing a wide variety of clients access to the contents of a database that: (1) does not require specific software for formulation of queries; and (2) allows data and file protections to be easily controlled on an individual basis. (*Id.*, col. 3:29-34) As background, the specification explains that the then-current computing environment typically consisted of several computer systems connected together to allow for data and file sharing, known as a network. (*Id.*, col. 1:13-19) The well-known Network File System

26

("NFS") protocol allows computers with different operating systems to share and access files across networks. (*Id.*, col. 1:27-34) NFS, a "common file system abstraction which is recognized by many software applications[,]" organizes data in a file system as a directory tree structure, wherein each branch is a directory that contains additional directories and files. (*Id.*, col. 1:38-40, 48-50) Files can be contained in one directory or organized into several directories. (*Id.*, col. 2:20-22) When a software application requests data from a file system, NFS protocol provides the data in the form of a directory tree, and upon receiving the contents of a directory, subsequent requests from the client can begin at that directory level instead of from the first level directory. (*Id.*, cols. 1:64-2:15) When a large number of files are at issue, the client may have to search through a large number of directories before finding the desired files. (*Id.*, col. 2:14-28)

For this reason, large numbers of files are often organized in a database such as a catalog instead of a directory tree structure. (*Id.*, col. 2:18-20) When requesting files in a database, a client can request data according to file characteristics or attributes, which provides flexibility and ease in searching and organizing information. (*Id.*, col. 2:29-33) For instance, an online catalog of products can include many files for each product, including a graphics file, a product description file, and a cost structure file, and these files can be grouped according to various attributes such as manufacture, color, size, or price. (*Id.*, col. 2:33-38) A client can formulate a query based on any combination of the various attributes to return a particular file or set of files. (*Id.*, col. 2:38-43) Structured Query Language ("SQL") is a typical database search language, and in an SQL search, data has attributes known as classifiers that are set to specific values. (*Id.*, col. 2:47-48, 63-65) For example, a specific file in a product catalog might have the classifier "SIZE" set to "CHILDRENS," the classifier "COLOR" set to "GREEN," and the classifier

27

"CATEGORY" set to "CHAIR." (*Id.*, cols. 2:65-3:2)

The specification recognizes some problems with this type of SQL query. First, this method requires clients accessing the database to have application-specific software to formulate the query. (*Id.*, col. 3:4-6, 11-13) Second, to further define a query—for example, to add the classifier "SEASON=FALL" to the above request for a child's green chair—a client must usually reformulate the entire search. (*Id.*, col. 3:9-11, 14-15) Third, with this type of organization structure, it is difficult to control access to individual files and to therefore provide different access rights to different clients. (*Id.*, col. 3:16-28)

The patentee sought to solve these problems by providing a method for converting data that is stored in a database in non-hierarchical fashion into a familiar hierarchical structure for display. (*Id.*, col. 5:4-7, 36-41) The invention enables users to view customized hierarchical data structures without requiring specialized software or knowledge of the database organization. (*Id.*, cols. 5:7-10, 10:6-8, 32-40) According to the specification, this method "increases the usability of the database" and allows data to be presented on a user-by-user basis with improved precision. (*Id.*, col. 10:8-10, 41-45)

The patent contains nine independent claims (claims 1, 5, 9, 17, 22, 27, 31, 36 and 40). Claim 1, which the Court focuses upon here, claims:

> **1.** A method of providing an interface to a database, wherein the database includes a plurality of nonhierarchically organized classifiers of data and data linked to at least one of the classifiers, the method comprising:
>
> organizing a set of the plurality of nonhierarchically organized classifiers into a first hierarchical data structure according to a view established for a first client; presenting data to the first client according to the first hierarchical data structure; organizing a second set of the plurality of classifiers into a second hierarchical

28

data structure according to a view established for a second client; an[d] presenting data to the second client according [to] the second hierarchical data structure.

(*Id.*, cols. 15:63-16:9)

> **b.** *Alice*'s step one

Defendants contend that the '414 patent is directed to the abstract idea of "taking data that is not stored in a hierarchy and putting it in hierarchical form before presenting it to a user[,]" with claim 1 drawn to the idea of "the organization and presentation of information." (Civil Action No. 13-676-LPS, D.I. 11 at 13; Civil Action No. 13-678-LPS, D.I. 9 at 15; Tr. at 89) It is plain that Defendants are correct.

Claim 1 describes a method of providing an interface to a database containing information stored nonhierarchically, by: (1) organizing that information into a hierarchical data structure in a customized format for one client; (2) presenting that structure to the client; (3) organizing a second set of the information into a second hierarchical data structure in a customized format for a second client; and (4) presenting that structure to the client. ('414 patent, cols. 15:64-16:9)[14] *All* of these limitations describe the organization and presentation of

_____

[14] Versata asserted during oral argument that "there are claim construction issues contained in [c]laim 1" requiring resolution prior to deciding the Section 101 issue. (Tr. at 85) However, when asked what claim terms Versata was referring to, all Versata pointed to was the term "view." (*Id.* at 85-86) However, as Defendants' counsel points out, (*id.* at 88), "view" is explicitly defined in the patent as "a created environment that defines what data a client sees and how that subset of data is presented to the user[,]" ('414 patent, col. 10:46-48). Versata's counsel had, earlier in the oral argument, pointed to this very portion of the specification as describing "what a 'view' is." (Tr. at 84) Versata's counsel later stated that, as to the term "view," "we do believe it is defined in the specification[.]" (*Id.* at 99-100) The Court does not find that any of this provides a basis for postponing decision as to claim 1. For one thing, the Court is prepared to adopt Versata's proposed construction for purposes of resolution of the Motions. Even more importantly, Versata never articulates how its proposed construction of "view" would affect the Section 101 analysis.

information in hierarchical form. "The basic concept of selecting a useful subset of data from a larger stored pool of data, organizing it for review, and disseminating the collected and organized results to others is the fundamental process by which information is used and shared in the modern economy." *Mkt. Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, No. 14 C 4957, 2015 WL 3637740, at *6 (N.D. Ill. June 12, 2015) (citation omitted).

Versata does not seriously dispute that step one of the *Alice* framework has been satisfied with respect to the '414 patent. When asked at oral argument how the claim was drawn to more than just the asserted abstract idea, Versata had difficulty articulating a response, asserting that the claim is "talking about being able to provide a specific, specialized, customized set of data in a particular order from something that is not [in that] order . . . . I don't know if that answers [the Court's] question . . . . perhaps it's better stated as an inventive concept." (Tr. at 87-88) So Versata itself described the claim as being directed to organizing and presenting information—an abstract idea. The Court proceeds to step two of the *Alice* framework.

### c. *Alice*'s step two

Versata identifies the inventive concept of claim 1 of the '414 patent as the improvement of "multi-user database systems which allows separate clients to view custom-tailored hierarchical representations of nonhierarchical data." (*Id.* at 83; *see also id.* at 85-86 (asserting that claim 1 of the '414 patent provides a way to give custom, hierarchical views to two different customers based on data that is not stored in a hierarchical manner, without requiring specialized software)) The Court disagrees that the claim contains an inventive concept.

While claim 1 indeed describes the general method of organizing two sets of data stored in a database in nonhierarchical fashion into a hierarchy, and then presenting those data sets to

two different clients, it does not describe a *specific, particular* way of accomplishing that method

of organization. (*See, e.g.*, '414 patent, col. 5:7-10 ("Embodiments of the present invention

enable a client to access a database without special software or knowledge of the database

organization and classifiers."); *id.*, col. 15:16-19 ("The present invention may be implemented in

any type of computer system or programming or processing environment.")) Instead, the

limitations of the claim are expressed solely in broad, functional terms.[15] And it is not disputed

that the functions described in the claim (organizing data into a new structure and presenting it to

a client) that could even arguably be attributed to a computer amount to "purely conventional

computer activity." The claim thus does not include the type of "additional features" that ensure

that it is more than "a drafting effort designed to monopolize" the abstract idea itself. *Alice*, 134

S. Ct. at 2357. In sum, the Court fails to see how claim 1 of the '414 patent amounts to anything

more than restating the abstract idea with the instruction to "apply it." *See Netflix, Inc.*, 2015 WL

4345069, at *12-13 (finding that claims directed to the mere reorganization of data with no

fundamental alteration to the information itself "represents no more than an instruction to

'implement the abstract idea' of using selectable categories to filter search results with 'routine,

conventional activity'") (citation omitted); *see also CyberSource Corp. v. Retail Decisions, Inc.*,

654 F.3d 1366, 1370-72 (Fed. Cir. 2011).

---

[15]      In contrast, the query dialog box limitation in claim 1 in *Execware*, viewed in the light most favorable to the patentee, was a "meaningful limitation on the underlying idea of 'displaying, classifying, and organizing unspecified information' . . . in an unspecified transaction" that was "described with particularity" such that it was "possible to determine [from the claims] what constitutes a query dialog box and what does not." *Execware*, 2015 WL 4275314, at *13; *see also DDR Holdings*, 773 F.3d at 1259 (claims survived a Section 101 challenge where they "recite[d] *a specific way* to automate the creation of a composite web page by an 'outsource provider' that incorporates elements from multiple sources in order to solve a problem faced by websites on the Internet") (emphasis added).

### 3.    '593 patent

#### a.    The Invention

The '593 patent, asserted against Infoblox only,[16] is entitled "System and Method for Presenting Information Organized by Hierarchical Levels[,]" and was issued on April 22, 2008. The patent relates to a system and method for presenting information organized by hierarchical levels through a computer user interface. ('593 patent, col. 1:7-10)

The patent's specification explains that computer users can have difficulty deciphering the vast amount of information stored by modern computer systems. (*Id.*, col. 1:14-16, 20-22) As an example of a large and complex data structure that can easily overwhelm the user, the specification points to a listing of automobile parts. (*Id.*, cols. 1:27-28, 4:42-44) Typically, a user searching for a particular automobile part will find such parts organized by hierarchy levels, first arranged by non-homogeneous classifiers (such as part type, part family and subfamily), and then further organized by one or more indexed attributes (such as alphabetically by name or numerically by part number). (*Id.*, cols. 1:28-36, 4:42-48) According to this typical arrangement, then, a user searching an inventory of auto parts for available automobile radios would drill down through a hierarchical organization of data, beginning from a root node and navigating through descendant nodes that identify available parts by manufacturer and part type, in order to reach a list of parts indexed by part attributes. (*Id.*, col. 1:30-37) These lists are typically displayed on user interfaces as trees, tree grids, or flat lists. (*Id.*, col. 1:36-37)

One problem with conventional displays of large amounts of data is that the amount of

---

[16]    Accordingly, unless otherwise specified, all docket citations in this section are to Civil Action No. 13-678-LPS.

information displayed on the user interface can quickly extend beyond the computer screen as the user drills down through the hierarchy. (*Id.*, cols. 1:38-41, 1:65-2:1) This can cause users to "lose their presence of the state of the information displayed as the root and path followed to the information of interest are hidden from view when the user scrolls down to view the information." (*Id.*, col. 1:47-51) Figure 1 of the patent, reproduced below, illustrates this issue. If a user expands node C of FIG. 1, that will cause node D to extend beyond the view of a single computer screen, and the user will be unable to view the root node and node D in that single screen. (*Id.*, col. 2:6-9) If a user collapses node C, then node D will become visible in a single computer screen. (*Id.*, col. 2:10-11)



The patentee sought to solve this problem by designing a user interface that presents information organized into multiple hierarchy levels "in a manner that maintains a user's context of the state of the information presented." (*Id.*, col. 2:30-34) The new user interface displays

navigation bars for desired hierarchy levels while hiding irrelevant information from the computer screen by only displaying the path that the user has traversed. (*Id.*, cols. 2:34-41, 4:58-60) This presentation of information allows the user to "readily understand and navigate levels of the hierarchy with reduced effort and time." (*Id.*, col. 4:39-41)

The patent contains 7 independent claims (claims 1, 11, 18, 22, 28, 37 and 41). Claim 11, at issue here, claims:

> **11.** A method for presenting database classifiers organized by hierarchy levels, the method comprising:
>
>> [(1)] displaying a first hierarchy level having a first hierarchy database classifier label;
>>
>> [(2)] displaying a second hierarchy level having multiple second hierarchy database classifier labels;
>>
>> [(3)] activating one of the second hierarchy database classifier labels;
>>
>> [(4)] displaying information associated with the activated database classifier label or, if available, a third hierarchy level having multiple third hierarchy database classifier labels; and
>>
>> [(5)] hiding display of the unactivated second hierarchy database classifier labels;
>>
>> [(6)] wherein multiple database classifier labels represent database objects and a plurality of database classifier labels in multiple hierarchy branches are the same database classifier label having associated indexed, homogenous attributes of parts and each indexed, homogenous attribute represents a heterogeneous section of the parts sliced across the attributes of the parts and each displayed classifier label is displayed only once in each displayed hierarchy.

('593 patent, col. 8:5-27)

### b. *Alice*'s step one

Infoblox asserts that claim 11 of the '593 patent is directed to the abstract idea of "displaying data." (D.I. 9 at 11; *see also* Tr. at 96 (Infoblox's counsel arguing that claim 11 of the '593 patent is drawn to the abstract idea of "displaying and hiding information"))[17] Versata does not seriously dispute that the claim is drawn to an abstract idea, instead focusing its arguments on step two of the *Alice* test. (*See* D.I. 14 at 14 (noting Infoblox's step one argument, and responding that the claims do not preempt all uses of displaying data); Tr. at 100-01 (responding to the argument that claim 11 is directed to an abstract idea by pointing to the allegedly inventive concept at issue))

The Court agrees with Infoblox that claim 11 is drawn to the abstract concept of displaying data organized in hierarchical form. The steps include (1) "displaying" a first hierarchy level; (2) "displaying" a second hierarchy level; (3) "activating" a database classifier label for the second hierarchy; and (4) "hiding" display of unactivated classifier labels. It is clear that the "majority of the limitations" in claim 11, *see Ultramercial III*, 772 F.3d at 715, are directed to the concept of displaying (and hiding, i.e., not displaying) certain information. (*See* Tr. at 97 (Infoblox's counsel pointing out that the only limitation that is plausibly directed to something beyond the display of information is the "activating" limitation, but that step "doesn't

---

[17]     In its reply brief, Infoblox asserted a new argument with respect to the patent eligibility of the claims of the '593 patent that are directed to a "user interface." It contends that these claims do not fall within any of the four statutory categories of patentable subject matter ("process, machine, manufacture, or composition of matter"). (D.I. 17 at 2 (quoting 35 U.S.C. § 101)) Both because a party cannot properly save new arguments like these for its reply brief, *see, e.g.*, *Rockwell Techs., LLC v. Spectra-Physics Lasers, Inc.*, No. Civ.A.00-589 GMS, 2002 WL 531555, at *3 (D. Del. Mar. 26, 2002), and because the Court is declining to rule here on the eligibility of the patent's claims that are directed to a "user interface," the Court will not consider this argument here.

require anything to happen other than as a result of the activation, the next limitation, which is more displaying")) As this abstract idea amounts to the basic character of the claim, the Court proceeds to step two of the *Alice* framework.

### c. *Alice*'s step two

Versata asserts that the inventive concept contained in claim 11 is a method of "present[ing] [] information in a format that's easily understandable by the user by using these database classifier labels that we have available in the database" and "hiding the display of the inactivated" database classifier labels, an asserted improvement over the then-existing technology. (Tr. at 103-04; *see also id.* at 101-02 (Versata's counsel arguing that claim 11 describes "a novel way to use database classifiers to allow a user to . . . understand where they are in the hierarchy without losing their place using this specific implementation with the specific requirements of the database")) However, the claim suffers from some of the same fatal flaws described above with regard to claims 21-23 of the '282 patent and claim 1 of the '414 patent.

The supposed ingenuity of claim 11 is particular way of presenting relevant data to a user in an understandable, organized fashion. This is accomplished, as Versata noted, by displaying data in hierarchical form via the use of "database classifier labels" representing other items of data stored in the database, with the clicking on those labels resulting in associated information being displayed (and with display of unactivated labels being hidden). However, the utilization of labels (or database classifiers) to represent groups of data that have been organized hierarchically (without something more) cannot amount to an inventive concept—nor can using those labels to hide irrelevant data from display. *See Enfish, LLC*, 56 F. Supp. 3d at 1177 (finding no inventive concept in claims directed to organizing data in a logical table with labels

because "[u]sing [] labels to locate information is a basic concept that humans have long employed" as "labels are often the easiest way to locate information in [an organizational structure]" and the "[e]fficient location of data is an unremarkable feature of a data storage system, especially in the computing age"). Moreover, Versata never articulates how any portion of the claim's language could be said to implicate an inventive computing concept.[18] And it is clear from the patent's specification that this method can be implemented on "any type of computer system or programming or processing environment." ('593 patent, col. 5:23-25)

It may be true that claim 11 presents a new "method for presenting information organized by hierarchy levels," (*id.*, Abstract), even an "extremely useful" and "particularly elegant path [for] display[ing] information[,]" (Tr. at 96). But that is not the bar that a claim must pass to be subject matter eligible. *See, e.g.*, *Personalized Media Commc'ns, LLC*, 2015 WL 4730906, at *3 (where the method at issue lacked an inventive concept, noting that "[t]hat the method was a new means of transmitting information is not relevant to the [Section] 101 analysis"); *Enfish, LLC*, 56 F. Supp. 3d at 1182 ("Many useful inventions are unpatentable[.]"). Rather, the test is whether the claim contains "a limitation or combination of limitations that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon an ineligible concept itself." *Versata Dev. Grp.*, 793 F.3d at 1332. Claim 11 of the '593 patent fails this test, amounting to

---

[18]     For example, though one claim limitation implicates the step of "activating one of the second hierarchy database classifier labels" (and assuming that this step requires some form of computer programming), there is no argument from Versata that the use of this step could amount to an inventive concept under the law. (D.I. 9 at 13) In its briefing, Versata baldly asserts that "the claims of the '593 patent relate to improvements to computer technology itself[,]" but later says no more about what it is in claim 11 that embodies those asserted improvements. (D.I. 14 at 14) The most Versata does say about the patent is that its claims "require[] a computer[,]" (*id.* at 16), which, as noted above, is insufficient to beat back Infoblox's step two challenge.

little more than the abstract idea of displaying (and hiding, or not displaying) data that has been labeled and hierarchically organized.

### 4.    '481 patent

#### a.    The Invention

The '481 patent, asserted against Infoblox only,[19] is entitled "Method and Apparatus for Sorting Products by Features[,]" and was issued on September 16, 2008.  The patent's invention relates to a computer system that stores product configurations and product configuration information, and provides product selections to a user in accordance with searches performed by the user based on either product features or product model identifiers.  ('481 patent, Abstract)

The specification of the '481 patent explains that in the past, producers of products have dispersed product information to consumers using various types of media (including print, radio and television), and the emergence of the Internet has resulted in greater access to product information for the average consumer.  (*Id.*, col. 1:39-45)  Entities communicating product information relied on networking and client/server technology in existence during the period of ten to fifteen years prior to the invention.  (*Id.*, col. 1:46-49)  This technology entailed a user employing a web browser to gain access to a server, which server would respond to requests from the client terminal by providing information in the form of an electronic document made up of one or more web pages.  (*Id.*, col. 1:49-59)  These web pages are written using Hypertext Mark-up Language ("HTML"), which provides standardized formatting and allows a server to specify hyperlinks to other servers and files.  (*Id.*, cols. 1:63-2:1)  Upon clicking a hyperlink, the user's

---

[19]    Accordingly, unless otherwise specified, all docket citations in this section are to Civil Action No. 13-678-LPS.

38

client terminal makes a request to the associated server. (*Id.*, col. 2:1-4) The client terminal then receives an HTML file that is interpreted by the browser, causing an electronic HTML document comprised of one or more web pages to display on the client's terminal. (*Id.*, col. 2:3-7)

This technology was "less than ideal" for a consumer selecting and purchasing products on the Internet, especially when the consumer wished to first compare a large number of products side-by-side in order to evaluate the differences between the products. (*Id.*, col. 2:8-15) The invention purports to address this issue by providing a software architecture and process that enables a user to identify products by searching for desired features or product identifiers. (*Id.*, col. 5:9-35) A user visiting a website that utilizes this architecture can perform searches based on such information, and the website will then display the results, generate comparable product configurations, store the results and perform related tasks. (*Id.*) The invention purports to reduce the need for user interaction while a consumer engages in product comparison, which in turn can improve a website's ability to handle increased traffic and the consumer's buying experience. (*Id.*, col. 2:15-19)

As an example of the invention, the patent's specification describes a website, carOrder.com, that a user can visit to purchase a new vehicle. (*Id.* at FIG.4) A user visiting carOrder.com for the first time can activate a hypertext link that enables the user to register for an account. (*Id.*, col. 10:3-6, 17-20) Completion of this step enables the user to then access a "Virtual Garage®" storage area, a web page that "facilitates comparison price shopping by allowing a user to store product-related information concerning multiple products and examine such information." (*Id.*, col. 10:32-40) Using the carOrder.com website, the user can access a database containing information organized by the make and model of available vehicles, and

utilizing hypertext links, can compare vehicles within that database with vehicles that have been saved in the user's Virtual Garage. (*Id.*, col. 10:46-51) Alternatively, a different hyperlink text on the web site allows the user to search that same database based on vehicle features rather than make and model. (*Id.*, col. 10:51-54)

The patent contains 4 independent claims (claims 1, 26, 50 and 70). Claim 50, at issue here, claims:

> **50.** A method of using a computer system to provide one or more product selections to a user in accordance with product related data provided by the user, the method comprising:
>
>> receiving the product related data from the user via a data processing system;
>>
>> identifying products stored in a memory based on two different types, (A) and (B), of product identification, wherein the memory stores product configuration information for multiple products, the product configuration information includes product features, and the two different types of product identification comprise:
>>
>> (A) searching for products in the memory based on product features included in the product related data if the product related data represents the one or more product features; and
>> identifying one or more products stored in the memory that each include the one or more features, if the product related data represents the one or more product features; and
>>
>> (B) identifying one or more products stored in the memory that are identified by a product model identifier, if the product related data represents the product model identifier; and
>> providing identified products to the user for display by the data processing system of the user.

(*Id.*, col. 28:3-27)[20]

###### b.    *Alice*'s Step 1

Infoblox argues that the claims of the '481 patent are directed to the abstract idea of

"searching data using features and product numbers." (D.I. 9 at 18; *see also* Tr. at 107

(Infoblox's counsel indicating that the '481 patent "has . . . the simplest abstract idea of any of

[the asserted patents—that of] searching an inventory both by an attribute and a model number"))

The Court agrees.

Claim 50 of the patent describes several steps for utilizing a computer to furnish a user

with product information, with the computer: (1) "receiving" the product data from the user

from a data processing system; (2) "identifying" products stored in a memory based on two

different types of product identification: (a) "searching" for products based on product features

and identifying products including those features; and (b) "identifying" products stored in the

memory identified by a product model identifier; and (3) "providing" the results to the user.

('481 patent, col. 28:3-27)  Clearly, the "majority of the limitations" in claim 50 (indeed, *all* of

the limitations) are directed to running a search of products based on product features and model

numbers.  It is well-settled that a method of searching for information based on particular

categories is an abstract idea.  *See, e.g., Cyberfone*, 558 F. App'x at 992 ("using categories to

organize, store, and transmit information" and "collecting information in classified form, then

separating and transmitting that information according to its classification" are well-established

---

[20]     The Court notes that on October 24, 2013, the PTAB granted a petition to institute
CBM review with respect to all claims of the '481 patent. *Volusion, Inc.*, 2013 WL 8538866.
Prior to the PTAB's issuance of a final written decision, Versata and the petitioner reached a
settlement, and the PTAB therefore granted the parties' joint motion to terminate the proceeding.
*Volusion, Inc.*, 2014 WL 2797107.

abstract ideas); *Netflix, Inc.*, 2015 WL 4345069, at *11 ("filtering search results using selectable categories" is an abstract idea); *Landmark Tech., LLC v. Assurant, Inc.*, CASE NO. 6:15-CV-76-RWS-JDL, 2015 WL 4388311, at *5 (E.D. Tex. July 14, 2015) ("searching for and retrieving information on a computer system" is an abstract idea); *Cogent Med., Inc. v. Elsevier Inc.*, 70 F. Supp. 3d 1058, 1063 (N.D. Cal. 2014) ("maintaining and searching a library of information" is an abstract idea).

Versata does not meaningfully challenge this step of the *Alice* framework.[21] It does assert that the '481 patent generally is not directed to an abstract idea since it "itself states that '[t]he present invention relates to transacting commerce over a network, and more particularly, to a method and apparatus for processing information related to such commercial transactions.'" (D.I. 14 at 13-14 (quoting '481 patent, col. 1:34-37)) To that end, it argues, the patent "is directed toward improvements over then currently available systems by allowing for side-by-side comparisons of product while also improving the website's ability to handle increased traffic." (*Id.* at 14 (citing '481 patent, col. 2:15-20)) However, these concepts are not really at the heart of claim 50. Instead, claim 50 is directed to a method of searching products based on product features and model numbers "to provide *one or more* product selections to a user." ('481 patent, col. 28:3-4 (emphasis added)) The Court proceeds to *Alice*'s step two.

### c. *Alice*'s Step 2

Versata identified the inventive concept of claim 50 as "the improved way of searching for and providing product information using this computer implementation." (Tr. at 116)

---

[21]     *Cf. Volusion, Inc.*, 2013 WL 8538866, at *9 (noting that before the PTAB, Versata "d[id] not dispute" that the method set forth in claim 50 embraces an abstract idea).

Beyond that, Versata's counsel had "a hard time distilling [the inventive concept] down . . . . a hard time actually [] reducing it further than" the specific claim language of claim 50, adding only that the claim involves more than just conventional use of a computer because it utilizes "specialized programming." (*Id.*)

The Court concludes that Versata had difficulty in articulating the inventive concept in the claim because there is none. The claims are functional in nature, describing the generic act of searching a product inventory stored in a computer database by product features and product numbers. (*Id.* at 111)[22] The implementation of the search "consists of nothing more than conventional general-purpose computers and a database connected in the conventional way[.]" (D.I. 9 at 19; *see also* '481 patent, col. 5:55-58 (indicating that the present invention may be practiced using "a computer system of any appropriate design, in general, including a mainframe, a mini-computer or a personal computer system")) And despite Versata's bald assertion that the claim requires "specialized [computer] programming," a review of claim 50 indicates that there is nothing *in the claim* that could be said to meet this description. Nor does Versata point to any such claim component that fits this bill. Rather, as noted above, the actual language of the claim merely sets forth routine and generic processing and storing capabilities of computers that fail to remove the claim from abstraction. *See Clear with Computers, LLC v. Altec Indus., Inc.*, Case No. 6:14-cv-79, Case No. 6:14-cv-89, 2015 WL 993392, at *5 (E.D. Tex. Mar. 3, 2015) (rejecting the patentee's argument that many of the challenged limitations required specialized

---

[22] Because claim 50's limitations are expressed in such broad and functional terms, it appears that the claim would preempt nearly any application of receiving a request from a user's computer, searching through products based on two search criteria (product features and product numbers), and then providing the results to the user.

computer programming where "the claims as a whole broadly recite a simple process which . . . does not require the type of complex programming that confers patent eligibility"); *cf. Volusion, Inc.*, 2013 WL 8538866, at \*9 (noting that the "references to a computer in [claims including claim 50 of the patent] impose scant limitations on the machine[,]" leading to the conclusion that the claim was more likely than not subject matter ineligible).[23] "Stating an abstract idea 'while adding the words 'apply it with a computer'" amounts to a "mere instruction to 'implemen[t]' an abstract idea 'on . . . a computer'" and "cannot impart patent eligibility." *Alice*, 134 S. Ct. at 2358 (citation omitted).

The Court concludes that claim 50 of the '481 patent does not contain an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible invention. Therefore, the Court recommends that Infoblox's Motion be granted as to claim 50 of the '481 patent.

### 5.    '454 patent

#### a.    The Invention

The '454 patent, asserted against NetBrain only,[24] is entitled "Dynamic Content Caching Framework" and was issued on July 25, 2006. The patent's invention relates to a framework that allows for the caching and reuse of dynamically created documents. ('454 patent, cols. 1:8-9,

---

[23]    In comparison, in the one post-*Alice* case in which the Federal Circuit has found an invention to survive Section 101 review, the "claims at issue [] specif[ied] how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." *DDR Holdings*, 773 F.3d at 1258.

[24]    Accordingly, unless otherwise specified, all docket citations in this section are to Civil Action No. 13-676-LPS.

2:17-19)

According to the specification, web page caching systems that existed at the time of the invention required a significant amount of computation and were ineffective in dealing with dynamic web page content. (*Id.*, col. 2:12-16) The specification explains that web documents (or web pages) are stored on numerous servers that are connected to the Internet, each web page having its own universal resource locator ("URL") that indicates where the web page is located and how to access it. (*Id.*, col. 1:16-24) Web page designers write web pages in one of several standard document description or markup languages, such as HTML or Extensible Markup Language ("XML"). (*Id.*, col. 1:27-30) These languages allow the designer to create hypertext links to other web pages or other parts of the same web page by associating such links with specific words or phrases on the web page. (*Id.*, col. 1:30-36)

A user accesses web pages using a web browser running on a computer system connected to the Internet. (*Id.*, col. 1:41-45) Generally, the user viewing a web page clicks a hypertext link (normally displayed as a highlighted word or phrase), which causes the web browser to issue a hypertext transfer protocol ("HTTP") request for the associated web page to the server identified by the requested web page's URL. (*Id.*, col. 1:45-51) The designated web server then returns the requested web page to the web browser. (*Id.*, col. 1:51-53)

When the content of a web page is static, meaning it does not change frequently or require frequent updates, its performance depends primarily upon its ability to deliver requested documents to users. (*Id.*, col. 1:54-57) A web cache system is one way to make this process more efficient. (*Id.*, col. 1:60-62) A web cache stores a copy of the requested web page on at least one alternative web site that is closer to or more accessible to the user, enabling the server

to quickly respond to a user's request. (*Id.*, col. 1:62-66)

When web page content is more sophisticated, however, traditional web caching systems become ineffective. (*Id.*, col. 2:15-16) For instance, when a company offers products for sale online, it is ideal for the content of the web pages to be dynamic. (*Id.*, col. 2:3-5) If the user selects several product options from an opening web page, the content of a subsequent web page might be very different, depending on the options selected. (*Id.*, col. 2:5-7) To allow for such flexibility, many of these subsequent web pages are created by applications running on or in conjunction with the web server computer system only after a user has made a specific request. (*Id.*, col. 2:8-12) Production of dynamic web page content can be very computation intensive, and can significantly impact server performance. (*Id.*, col. 2:12-15)

The patentee sought to solve this problem by creating a "dynamic web content caching framework that allows for the caching and reuse of dynamically created documents in an efficient manner, thereby reducing the amount of computation required by web and/or application servers." (*Id.*, col. 2:17-21) This system manages files provided by a server computer system to a client computer system. (*Id.*, col. 2:31-33) A user viewing an interactive web page selects parameters that define a presentation state that describes, and is used to produce, a subsequent web page. (*Id.*, col. 2:34-36) When another user selects an identical presentation state, the existing file with that presentation information is identified quickly and reused. (*Id.*, col. 2:40-42)

The patent contains three independent claims (claims 1, 14 and 40). Claim 1, at issue here, reads as follows:

> **1.** A method of caching and retrieving cached dynamically generated files that each include presentation information

46

characterized by respective presentation states, wherein each dynamically generated file is associated with a file identifier that is derived from state information that describes contents of the associated dynamically generated electronic file and the file is operable to be provided by an application running on a server computer system to at least one client computer system, the method comprising:

> [(1)] receiving a file request that includes state information based on selections of a user interacting with a web page using at least one client computer system;
>
> [(2)] determining whether the file request identifies one of the cached dynamically generated files;
>
> [(3)] retrieving the dynamically generated file identified by the file request and transmitting the file to the at least one client computer system if the file exists in the cache;
>
> [(4)] computing presentation information based on the state information in the file request when a dynamically generated file does not exist in the cache; and
>
> [(5)] saving the computed presentation information in a file in the cache, thus creating a dynamically generated file, and transmitting the dynamically generated file to the at least one client computer system.

(*Id.*, cols. 7:55-8:12)

### b.    *Alice*'s step one

NetBrain asserts, pursuant to step one of the *Alice* framework, that claim 1 of the '454 patent is directed to the abstract idea of "providing access to a file by determining if the file exists in a storage system (cache), returning the file to the requester if the file exists, and if not, creating, storing, and sending the requested file." (D.I. 11 at 17)  According to NetBrain, these steps claim "the fundamental concept of conditional action"— the "conditioning one action on the existence of another action or circumstance." (D.I. 17 at 8)  The Court agrees with NetBrain

that claim 1 is drawn to an abstract idea.

The steps of the claim include (1) "receiving" a request for a file that includes state information based on parameters chosen by a user on a web page; (2) "determining" whether the file request identifies one of the stored dynamically generated files; (3) if so, "retrieving" that dynamically generated file and transmitting it to the user; (4) if not, "computing" presentation information based on the state information in the file request and (5) saving it in a file in the cache, thereby creating a dynamically generated file, and (6) transmitting that file to the user. ('454 patent, cols. 7:55-8:12) The central concept of the claimed invention is the idea of receiving a request for information and transmitting a response by either recycling old information or collecting the requested information into a new file that will be stored—in other words, a system meant to avoid reinventing the wheel every time a new request is received. (*See* Tr. at 118-19, 123-24) As NetBrain's counsel points out, this is a fundamental concept, a "basic human function" that people have been doing with or without computer-based help for years. (*Id.* at 123-24); *cf. Sinclair-Allison, Inc. v. Fifth Ave. Physician Servs., LLC*, No. Civ.-12-360-M, 2012 WL 6629561, at *4 (W.D. Okla. Dec. 19, 2012), *aff'd*, 530 F. App'x 939 (Fed. Cir. 2013) (the "notion of compiling data and recycling it for different purposes" is an abstract idea). The claimed concept is similar to a partner at a law firm asking an associate to draft a stipulation of dismissal and the associate determining if a sample exists from a previous case; if so, the associate copies that sample to complete the assignment; if not, the associate creates a new stipulation of dismissal based on the information provided, sends it to the partner and saves a copy. (Tr. at 123-24; D.I. 17 at 8-9) The Court proceeds to *Alice*'s step two.

        **c.**    ***Alice*'s step two**

A refrain throughout Versata's answering brief is that the '454 patent (and indeed, all of the asserted patents) is patent-eligible because it "describe[s] concrete improvements in computer technology." (D.I. 15 at 11; *see also id.* at 12-14)  But there is no elucidation from Versata backing up this refrain.  In its brief, in support of its statement that the '454 patent "represents an improvement to computer technologies in the marketplace," Versata simply quotes two sentences from the specification of that patent, and that is all.  (*Id.* at 13-14)  The quoted portion of the specification reads as follows:

> Moreover, traditional web page caching systems are ineffective when the web page content is dynamic.  Accordingly, it is desirable to have a dynamic web content caching framework that allows for the caching and reuse of dynamically created documents in an efficient manner, thereby reducing the amount of computation required by web and/or application servers.

('454 patent, col. 2:15-21)

At oral argument, Versata's counsel explained that "[y]ou are not just caching and retrieving, [but] you are receiving a file request that includes state information based on selections.  You are retrieving the file identified by the file request and transmitting [it] to the clients.  You are computing presentation information based on the state information, and then you are saving the computed presentation information." (Tr. at 126-27)  Counsel asserted that the claim entails more than just bare application of the concept of caching to a computer because it "is an improved method of caching that isn't directed towards just presenting the information, but rather how to effectively process and better program the computer to present this information more effectively." (*Id.* at 127)  When pressed about how the claim's language implicated the inventive use of the computer, Versata's counsel merely pointed to the claim:

Versata's counsel: [The use of the computer that is particularly

49

inventive here is] [p]erforming these particular steps to cache the dynamically generated files.

The Court: And in particular—

Versata's counsel: I think, actually, the preamble describes it pretty well, but, again, this is a case where I think because each limitation is important to the method that's being performed, it's hard to distill it down into one individual term that is going to be an inventive concept. The process that's described as a whole by completing these various steps results in a better method and an improved computer technology.

(*Id.* at 128)

Despite Versata's assertion to the contrary, the Court concludes that claim 1 of the '454 patent is devoid of any meaningful limitations that would make it patent eligible. Instead, the claim describes receiving a file request that includes state information based on user selections (such as "blue Hondas"), (Tr. at 118), retrieving the file if it already exists or creating a new file (and storing it for later recycling), and transmitting the file to the user—broad steps that simply automate an existing fundamental concept through the application of conventional and generic computer systems and components, (*see* D.I. 17 at 9); *cf. Alice*, 134 S. Ct. at 2359 (stating that "a computer 'operates . . . upon both new and previously stored data'") (quoting *Gottschalk*, 409 U.S. at 65). Unlike the claims at issue in *DDR Holdings* and *Execware*, these generic steps do not describe a specific solution with specific functionality.[25] "[I]f a [claim's] recitation of a

---

[25] This conclusion is corroborated by portions of the specification describing the invention. (*See, e.g.*, '454 patent, col. 5:29-35 (describing the dynamic content caching framework, explaining that the process begins where a web server receives a URL for a selected subsequent state, and "[t]he server **100**, cache manager **110**, file server **140**, or some other process determines if the file described by the URL exists in the cache"); *id.* at 6:37-39 (explaining that the step of computing presentation information based on the state information in the file request "can be performed by cache manager **110**, or some other application").

computer amounts to a mere instruction to implement an abstract idea on a computer, that addition cannot impart patent eligibility." *Alice*, 134 S. Ct. at 2358 (internal quotation marks, citations and edits omitted).

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that claims 21-23 of the '282 patent, claim 1 of the '414 patent, claim 11 of the '593 patent, claim 50 of the '481 patent and claim 1 of the '454 patent, are not eligible for patent protection under 35 U.S.C. § 101.  Therefore, the Court recommends that Defendants' Motions to Dismiss be GRANTED as to those claims.  The Court recommends that Defendants' Motions to Dismiss be DENIED as to the remaining claims of the asserted patents, without prejudice to renew a Section 101 challenge hereafter.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated:  September 30, 2015

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

51